E3ELRAMS1                          Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            11 CR 1032 (PAE)

5    ANIBAL RAMOS,

6                    Defendant.

7    ------------------------------x

8                                           New York, N.Y.
                                            March 14, 2014
9                                           3:23 p.m.

10
     Before:
11
                        HON. PAUL A. ENGELMAYER,
12
                                            District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     NOLA HELLER
17        Assistant United States Attorney

18   BENNETT EPSTEIN
     STEVE ZISSOU
19        Attorneys for Defendant

20   ALSO PRESENT:  FRANCISCO OLIVERO, Spanish Interpreter
                    MARIA ELENA ALVARADO, Spanish Interpreter
21

22

23

24

25

1          (Case called)

2          THE COURT:  All right.  I'll note that we have an

3     interpreter here assisting Mr. Ramos today.

4          We're here today to impose sentence in United States

5     v. Anibal Ramos.  Mr. Ramos pled guilty on April 15, 2013, to

6     conspiracy to participate in a racketeering enterprise and to

7     participation in a conspiracy to violate the narcotics laws of

8     the United States.

9          In preparation for today's proceeding I have reviewed

10    a substantial volume of materials and I'm going to list them

11    for counsel.

12         I've reviewed the plea agreement and the transcript of

13    the plea proceedings.  I've also reviewed a couple letters that

14    Mr. Ramos sent me at an earlier stage in the proceeding

15    relating to prison access issues.  I have reviewed the

16    presentence report dated February 11, 2014, including the

17    recommendation and addendum to that report.

18         I've also received and reviewed the following

19    additional submissions specific to the sentencing process:

20    defendant's letter dated October 6, 2013 to the probation

21    officer objecting to an earlier version of the presentence

22    report, defendant's supplemental letter dated October 17, 2013

23    containing other objections to that report, defendant's

24    sentencing submission dated March 4, 2014, which attaches the

25    defendant's earlier submissions to the probation department, a

E3ELRAMS1                          Sentence

1   January 3, 2014 letter from the defendant to the Court, and a

2   February 9, 2014 email from the defendant to Mr. Epstein.  It

3   also attaches a job evaluation form for Mr. Ramos's work at the

4   MDC and transcripts of two wiretap conversations in which

5   Mr. Ramos participated.

6            I also reviewed a supplemental sentencing submission

7   dated the same day as the main sentencing submission, March 4,

8   2014, this one submitted by Mr. Ramos's other lawyer,

9   Mr. Zissou, which in turn attaches two letters in support of

10  Mr. Ramos from his children.

11           I have reviewed the government's sentencing submission

12  dated March 11, 2014.  And, finally, I have reviewed

13  defendant's second supplemental sentencing submission dated

14  March 12, 2014.

15           So with that long recitation, have the parties

16  received each of those submissions?

17           MS. HELLER:  We have, your Honor.

18           MR. EPSTEIN:  Yes, your Honor.

19           THE COURT:  Is there anything I've left out?

20           MR. EPSTEIN:  No, sir.

21           MS. HELLER:  No.

22           THE COURT:  Okay.  Turning then to the presentence

23  report -- and because I've been given two iterations of it, to

24  be quite clear, I'm referring to the later one dated

25  February 11 of this year.

E3ELRAMS1                          Sentence

1              Mr. Epstein, have you read the presentence report?

2              MR. EPSTEIN:  I have.

3              THE COURT:  Have you discussed it with your client?

4              MR. EPSTEIN:  I have.

5              THE COURT:  Mr. Ramos, have you read the presentence

6    report?

7              THE DEFENDANT:  (All answers in English) Yes, your

8    Honor.

9              THE COURT:  And have you discussed it with

10   Mr. Epstein?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  The answer is yes?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  Have you had the opportunity to go over

15   with Mr. Epstein any errors in the report or anything else that

16   should be taken up with the Court?

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  How about you, Ms. Heller, have you

19   reviewed the presentence report?

20             MS. HELLER:  I have, your Honor.

21             THE COURT:  I know there's been some back and forth

22   between counsel vis-a-vis the report.  What I'm interested in

23   understanding is concretely as to the specific factual

24   representations in the report, put aside the guideline range

25   for a moment, are there any objections to the report regarding

1    its factual accuracy?

2            MR. EPSTEIN:  Other than as written by our letters in

3    which we took issue with probation report's characterization of

4    several different matters, we have no other objections.

5            THE COURT:  That's important.  But I think what I need

6    to do is now have you cast your objections here and now as it

7    relates to the specific parts of the presentence report.  It

8    looked to me as if the paragraphs in question that may be of

9    consequence here are between 60 and 62.

10           MR. EPSTEIN:  I think that's correct, your Honor.

11           THE COURT:  Why don't we do this.  Just in the

12   interest of having a focused conversation, why don't you go

13   step-by-step and starting with paragraph 60, tell me what if

14   anything there you object to and I'll then hear from Ms. Heller

15   on the point and we'll see whether or not the objections can be

16   resolved, smoothed over, determined to be immaterial, or

17   whether we need to do something else to resolve the factual

18   dispute.

19           MR. EPSTEIN:  I'll attempt to do that, Judge.  I hope

20   I'm complete.

21           THE COURT:  If you could keep your voice up.

22           MR. EPSTEIN:  Can you hear me now?

23           THE COURT:  Much better.

24           MR. EPSTEIN:  Okay.  Your Honor, we discuss in our

25   letter, on page 5 of our main letter, if I can call it that,

E3ELRAMS1                         Sentence

1    and I'm referring to my letter of --

2              MR. ZISSOU:  Judge, I'm sorry, I don't mean to

3    interrupt Mr. Epstein.  But Mr. Ramos doesn't need the

4    interpreter and so we've elected to proceed without it.  He's

5    happy to answer any inquiry that your Honor may have.

6              THE COURT:  Is that right, Mr. Ramos?  You answered my

7    earlier question in English.  Are you comfortable doing that?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  Can you fully understand everything I've

10   said before?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  And what your counsel have said?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  Okay.  Very good.

15             Are counsel okay if we excuse the interpreter?

16             MR. ZISSOU:  Well, actually, Judge, the secondary

17   request is that you allow them to interpret for Mr. Ramos's

18   wife because she's present in the courtroom.  She doesn't have

19   the same hold of the English language.

20             THE COURT:  I want to make sure that doesn't create

21   any issue for our hardworking interpreters.

22             THE INTERPRETER:  Thank you, your Honor.

23             THE DEFENDANT:  Thank you very much.

24             THE COURT:  I guess, Mr. Epstein, what I'm hoping to

25   do here, although I've read your letters -- there has been

1    enough back and forth here -- I'm hoping the issues may be a

2    little more narrower or more crystallized.  Rather than

3    recapitulating a reference to your letter -- and I'll pull it

4    out here -- I'm hoping you can articulate for me concretely

5    what you'd like removed or changed or modified as to

6    paragraph 60.

7              MR. EPSTEIN:  Sixty.

8              THE COURT:  Look, I see your letter from March 3 which

9    says that you believe that these three paragraphs contain

10   materially erroneous characterizations.

11             Is there anything inaccurate in paragraph 60, putting

12   aside whether you'd like to add anything, is there anything

13   written there that is inaccurate?

14             MR. EPSTEIN:  No, your Honor.  Paragraph 60 is

15   accurate.

16             THE COURT:  Okay.  Let's turn to paragraph 61.

17             MR. EPSTEIN:  Yes, your Honor.  The way that phone

18   call is described in paragraph 61 we object to in its entirety,

19   and I think we specified in my letter on pages 5 and 6.

20             THE COURT:  And, look, I've read both parties'

21   competing constructions of the conversation.

22             Ms. Heller, I'm happy to hear from you.  I will give

23   you both this initial reaction which is there's a lot broader

24   context than this one conversation.  I think I understand

25   enough about Mr. Ramos's role and the nature of El Combo such

 1    that it's not clear to me that it's necessary for me to resolve

 2    the competing characterizations, if you will, of this

 3    particular phone call.  I've read the words used on the call,

 4    and it's not clear to me how productive it would be, in effect,

 5    to excavate the different interpretations here.

 6           And so my instinct, but I'm happy to hear from both of

 7    you before I move off of it, is that it is not necessary to get

 8    to a unitary interpretation of what was meant on that call for

 9    me to arrive at a reasonable sentence in this case.

10           MR. EPSTEIN:  I agree with that, Judge.

11           MS. HELLER:  As do we.

12           THE COURT:  Then, Ms. Heller, just in the interest of

13    simplicity and clarity of the sentencing record, I guess the

14    safe thing to do is to state that I will disregard, therefore,

15    paragraph 61.  In other words, I've read the transcript of the

16    call.  Each of you has a very different construction of what

17    goes on in the call.  I feel like I'm well situated to sentence

18    Mr. Ramos based on a whole host of other things that give me a

19    good understanding of this case.  It's not clear to me I need

20    to do anything other than acknowledge that I've read the

21    transcript of the call and I'm taking the words of the call for

22    what they're worth.

23           I'm trying to figure out, counsel, I want to move past

24    this so it doesn't become a needless appellate issue, frankly,

25    when it's not consequential to me.

E3ELRAMS1                    Sentence

1              MR. EPSTEIN:  I wholly agree, Judge.

2              MS. HELLER:  That's fine, your Honor.  Your Honor

3     could disregard paragraph 61 and 62 with the understanding,

4     because they both summarize calls, with the understanding that

5     your Honor has read the calls and are not disregarding what

6     your Honor has read but would just not have the

7     characterization of the calls in the PSR.

8              THE COURT:  Are you comfortable with that?

9              MS. HELLER:  Totally fine.  In fact, your Honor, the

10    only reason we have been including summaries sometimes of the

11    calls is that I believe in prior sentencings your Honor had not

12    been considering wiretap calls unless they were in the PSR.  So

13    that's why we put it in.

14             THE COURT:  And I appreciate your doing that.  And as

15    you know, the challenge here, right, is that often there's a

16    lot of texture about the particular defendant's role and if

17    it's not in the PSR and then we get into an issue of whether I

18    can credit the government's sentencing memo at sentencing.  So

19    the better course is to put it in the PSR and force the issue

20    as to whether there's a factual dispute.

21             MS. HELLER:  Right.

22             THE COURT:  In this particular case, I've read the

23    transcript and I don't regard the resolution of the subjective

24    intent of Mr. Ramos on these particular calls as really moving

25    the needle.  So I think one way to do this is simply to say

1   whether 61 and 62 are in or out, they would not affect the

2   sentence I would impose here.  But counsel are on notice that I

3   have read the transcripts of the calls and I am considering

4   those transcripts for the words articulated and reflected

5   there.

6           MS. HELLER:  And that sounds perfectly fine to us,

7   your Honor.  And our offer stands that we put in our submission

8   that if your Honor wants further interpretation from a witness,

9   we'd be happy to offer a witness who was a participant in the

10  call who could explain them.

11          THE COURT:  Mr. Epstein, are you comfortable with

12  that?

13          MR. EPSTEIN:  I am, Judge.

14          THE COURT:  All right.  Having heard no objection to

15  paragraph 60 and with the understanding that what is in 61 and

16  62, although remaining in the report is not material to the

17  sentence I would impose, are there any other factual objections

18  to the PSR?

19          MR. EPSTEIN:  No, Judge.  I think that's it.

20          THE COURT:  Okay.  All right.  How about you,

21  Ms. Heller, any factual objections from the government?

22          MR. EPSTEIN:  No, your Honor.

23          THE COURT:  Okay.  The presentence -- I will then

24  adopt the factual recitations set forth in the PSR in its

25  entirety while making the point that paragraph 61 and 62 are

1    not ones that will be consequential to my sentencing

2    determination.

3         The presentence report will be made a part of the

4    record in this case.  It will be placed under seal.  In the

5    event an appeal is taken, counsel on appeal may have access to

6    the sealed report without further application to the Court.

7         Is there any reason why counsel's sentencing

8    submissions should not be publicly filed?

9         MR. EPSTEIN:  No, your Honor.  I believe I did.

10        THE COURT:  You may well have.  I just as a matter of

11   course want to make sure that people do so.

12        MR. EPSTEIN:  I believe your Honor's rules called for

13   that and I did file them ECF.

14        THE COURT:  You'd be surprised how often they are not

15   and that's why I have this line in my sentencing script.

16        MS. HELLER:  Your Honor, as per your standing

17   directions, we haven't yet filed.

18        THE COURT:  Very good.  Thank you.

19        MS. HELLER:  But we will.

20        THE COURT:  We now come to the issue of the sentencing

21   guidelines.  Although the Court is no longer, of course,

22   required to follow the sentencing guidelines, I am required to

23   consider the applicable guidelines in imposing sentence.  To do

24   so it's necessary that the Court accurately calculate the

25   guideline sentencing range.

1            In this case there is a plea agreement.  The parties

2     stipulated to a particular calculation of the sentencing

3     guidelines.  They agree that the offense level is 27, the

4     criminal history category was III, and the guideline range was

5     87 to 108 months.  The PSR has accepted the parties'

6     calculation of the offense level, 27, and with no objection to

7     that I will so find that the offense level is 27.

8            The PSR, however, has calculated Mr. Ramos's criminal

9     history at IV based on a 1996 youthful juvenile offender

10    adjudication which had been sealed at the time of the parties'

11    plea negotiations and, therefore, was not known.

12           Counsel, if you choose to disagree, I'll give you the

13    opportunity to, but let me set out my views about this at the

14    outset having read the submissions.

15           I am persuaded that that offense does as a technical

16    matter count in the calculation of Mr. Ramos's criminal

17    history, meaning that the criminal history category would be IV

18    and the guideline range would then be 100 to 125 months.

19           However, like Ms. Heller, I think there is an

20    important value in respecting the parties' plea agreement.  It

21    was negotiated in good faith by all sides and, therefore, I am

22    prepared to commit to you all that I will not sentence the

23    defendant to a sentence above the negotiated guideline range of

24    87 to 108 months' imprisonment.

25           With that, I would hope there isn't any need for us to

E3ELRAMS1                              Sentence

1    have legal argument as to the youthful juvenile offender

2    adjudication, but I give you the opportunity to do so.

3         MR. EPSTEIN:  No, your Honor.  That's perfectly fair

4    and I appreciate that very much.

5         I would like to add, however, though, a matter came up

6    recently because of a recent event in Washington and I'm

7    referring to the proposed two points less guideline that

8    apparently is on the verge of being passed.  And Ms. Heller and

9    I had an email dialogue about that and my understanding was

10   that the attorney general directed local prosecutors not to

11   oppose the advance imposition or consideration of the two

12   points less guideline.

13        When I questioned Ms. Heller about that she indicated

14   that although that was stated in the press, apparently the DOJ

15   policy is more nuanced than that and that the government is

16   going to oppose if I ask the Court to impose two points less.

17        MS. HELLER:  The nuance is as follows.  We are

18   directed to follow what's been colloquially been known as the

19   Holder memo in terms of applying this new downward adjustment.

20   And what the Holder memo specifies is that high-level or

21   violent offenders would not be subject to Holder memo

22   consideration and this downward adjustment.

23        So for Mr. Ramos, we certainly consider him a

24   high-level offender in this case and a high-level member of a

25   violent gang.  So we already met with the supervisors as to

1   Mr. Ramos in particular yesterday when the memo came down, and

2   the office concluded he would not be eligible for that based on

3   the Holder memo's terms.

4            THE COURT:  Look, I take it I can take for what it's

5   worth the fact of the broader reconsideration in Washington of

6   the severity of punishments for marijuana dealing, even if the

7   guidelines themselves, the guideline calculation themselves

8   stays intact.  Correct?

9            MR. EPSTEIN:  I think that's perfectly fair, Judge.  I

10  wanted to point out to your Honor that apparently the text of

11  the proposed guideline does not say what the Holder memorandum

12  says.  The text does not make that a factor, the high-level

13  caveat does not make it a factor -- I read the text last

14  night -- and that the policy reasons behind the two points less

15  would still apply to Mr. Ramos, those policy reasons being of

16  course the fact that sentences are too long, that sentences for

17  marijuana in particular are too long, and sentences on minority

18  people punish their families disproportionately.

19            With that being said, I'm not going to ask your Honor

20  to adjourn the case until the new guideline comes into effect

21  in November sometime, especially since your Honor has expressed

22  what I think is the appropriate view that the Court is free to

23  take that into consideration.

24            THE COURT:  In the 3553 world, where that is the

25  determinative framework, it seems to me I'm at liberty to

1  factor in the Justice Department's reassessment of the severity

2  of punishments for marijuana distribution, and I will consider

3  that for what it's worth.  It's duly noted.

4          MR. EPSTEIN:  That's perfectly fine.  Thank you,

5  Judge.

6          THE COURT:  All right.  So the record is clear, I find

7  that the guideline range that applies here is 100 to 125

8  months.  I am, however, committed to not imposing a sentence

9  above the negotiated range of 87 to 108 months.  And so the

10  record is crystal clear, the sentence I'm going to impose in

11  this case would not be any different regardless of whether the

12  guideline range here were calculated as 87 to 108 or 100 to 125

13  months.

14          Okay?

15          MR. EPSTEIN:  Okay.

16          THE COURT:  It's the underlying facts, ultimately, and

17  not this rather technician's nuance as to how the guidelines

18  get calculated that is what matters to me.

19          MR. EPSTEIN:  We understand that, Judge.

20          THE COURT:  The next subject I need to touch upon but

21  just that is departures which is within the guidelines

22  framework in the plea agreement, both parties agree that

23  neither an upward nor a downward departure within the

24  guidelines framework is merited, although the parties' reserve

25  the rights to move for variances in either direction.

1          Having reviewed the PSR and the parties' submissions,

2     I share that conclusion.  I don't think as a matter of strict

3     guidelines law that a departure is available here as a matter

4     of law and I decline, therefore, to depart.

5          Okay.  Having dealt with the guidelines, does the

6     government wish to be heard with respect to sentencing?

7          MS. HELLER:  Yes, briefly, your Honor.  Our sentencing

8     submission contains really the heft of what we wanted to say

9     here.

10         But Mr. Ramos is actually, he's an unusual defendant

11    in this case because -- and Mr. Epstein correctly assesses in

12    his sentencing submission basically how we got to him.  We

13    always knew about him from witnesses that we've had on a

14    long-term basis, and as we were doing the wiretaps in his case,

15    he started to come over them.

16         But as your Honor knows, this was really a case

17    focused on the Bad Boys sect and not on the El Combo sect, but

18    Mr. Ramos came over our wiretap and we had more witnesses who

19    gave us information about him.  When we arrested Mr. Ramos and

20    it became clear to us as we already knew he was the leader of

21    the El Combo sect, which was the rival of the very dangerous

22    Bad Boys sect.  And Mr. Ramos, we don't know as much about what

23    exactly he ordered, what exactly he had his hands in in terms

24    of what his lower down with the lower members in El Combo did.

25         We do know, very clearly know that he was the head of

1     El Combo and that we actually have witnesses who were above him

2     and who communicated with him about high-level management

3     issues about the gang.  Mr. Ramos attended committee meetings.

4     He communicated with Mr. Sierra.  And Mr. Ramos had the

5     authority to weigh in on matters of violence.

6              And as we included in our sentencing submission, one

7     of the main issues that was playing out in 2011 was Flaco, who

8     was the head of the 268 Sunset faction of the Trinitarios gang.

9     And what was happening there was that Flaco, whose real name is

10    Alberto Santana, had decided he was going to take his sect,

11    which was really a Brooklyn sect, and bring them to the Bronx.

12    And this was very upsetting to El Combo and the Bad Boys

13    because the Bronx was their territory.

14             And this was a war.  There were numerous shootings

15    back and forth between 268 and various sects in the Bronx.  And

16    that's part of what we know about Mr. Ramos specifically is

17    what he was up to in 2011.  He was involved in high-level

18    discussions with Gonzalez, who was the head of the overall

19    Bronx, about what to do about Mr. Santana, about Flaco, you

20    know.  And according to Mr. Gonzalez, there was a green light

21    issued against Flaco and Mr. Ramos would have had the power to

22    oppose that and say no, I don't want.

23             THE COURT:  Was it a green light to kill him or a

24    green light to injure him?

25             MS. HELLER:  So a green light is an interesting

1    concept in Trinitarios lore, and your Honor will hear more and

2    more about it.

3            THE COURT:  For the record, Ms. Heller knows this, I'm

4    currently presiding over a lengthy trial involving two

5    defendants who are alleged to be members of the Bad Boys.  So

6    I'm in the process of getting something of an education beyond

7    what I've learned in the sentencing process.

8            MS. HELLER:  Yes.  But what a green light is is

9    authorization from a high-level member of the gang -- and only

10   certain people had the ability to issue green lights -- that a

11   fellow member of the gang should be acted against.  And what

12   that could mean is an assault or it could mean as bad as a

13   murder.  It basically means do what you have to do to this

14   person and if the person ends up dead, okay.  And but it's only

15   against a fellow member of the gang.

16           So there was a green light against Santana and

17   Mr. Ramos didn't authorize that green light, but he also didn't

18   oppose it, and that is as close as we can come to a specific

19   act of violence that we've associated with him.

20           And, again, to be very frank, and I think Mr. Epstein

21   would agree with me, the reason why -- or maybe he won't agree

22   with me on the reason but he'll agree with me that we don't

23   have any other specific acts -- the reason why is we don't have

24   any of the people who worked under him in this case.  So we

25   don't have as many specifics, and we weren't wiretapping his

1    phone.  But we certainly do know about that and we do know

2    about his role and we do know about his long-time role as the

3    head of El Combo.

4           We also know about the violent back and forth between

5    El Combo and the Bad Boys.  And as your Honor knows, the murder

6    of Izzy Dominguez resulted from that back and forth.  That was

7    a shootout in 2009 in the Bronx between members of the Bad Boys

8    and members of El Combo and Izzy Dominguez, who was a member of

9    El Combo, was killed in that shootout.  Julian Lopez in this

10   case has pleaded guilty to his participation in this shootout.

11   But that is how --

12          THE COURT:  Is Julian Lopez a Bad Boy?

13          MS. HELLER:  He is a Bad Boy.  Your Honor, Mr. Ramos

14   is the only member of El Combo in this case.  So it wasn't made

15   up, this war, and there was a back and forth and someone did

16   end up dead as a result.

17          Mr. Ramos also ran a significant marijuana

18   distribution operation.  And the search warrant I neglected to

19   put in my sentencing submission.  I just want to make clear for

20   your Honor there was a search warrant executed at his house the

21   day of his arrest and found at that search warrant was in a

22   safe there was a handgun and the handgun was inoperable.  It

23   was in quite a state of disrepair -- it was missing a bunch of

24   essential parts.  But there was a handgun that was recovered as

25   well as ammunition in a plastic bag.  There were multiple bags

of marijuana that were packaged for distribution in plastic,

small plastic bags.  There was also a white bag of cocaine, and

there was a Trinitarios constitution.  There was drug

paraphernalia, little packaging bags, and there were beads

associated with the Trinitarios.  So that was all found in

Mr. Ramos's apartment on the day of his arrest, and I neglected

to put that in my submission.  It should have been in there.

          As far as the gun, we're not going to make any

significant arguments about the gun because, again, it was a

broken gun and we don't have any specific examples of Mr. Ramos

using a gun; in fact, to the contrary.  What our evidence would

show at a trial would have shown at a trial against Mr. Ramos

was that he was not a street actor.  He was someone who

directed others.  He had a first in command whose name was

Marceluto, that was his nickname, and that was a person who he

called upon to carry out whatever acts he was going to order.

But Mr. Ramos was not controlling the streets and firing guns

and I wouldn't say he was.  That wasn't his role.  He had a

job.

          And, as I said, we believe very much that he led a

double life in that he was actively involved in the management

of this violent gang, but he also was making money

legitimately, and he was running a marijuana distribution

organization.  So he is an interesting case.

          THE COURT:  Can I ask you how the 100 to 400 kilogram

E3ELRAMS1                        Sentence

estimate was arrived at?

              MS. HELLER:  Yeah.  I think the duration of the

marijuana trafficking and the nature of the business was I

believe in 24/7 operation over a long period of time and also

holding him responsible for the actions of coconspirators.

              THE COURT:  He's being held responsible as to

marijuana, solely for marijuana thought to be sold by El Combo?

              MS. HELLER:  Yes, your Honor.  And that's the quantity

that the parties agreed upon.

              THE COURT:  Understood.  I was curious how you got

there.

              MS. HELLER:  It's very large quantity, but I think it

goes to the length of time that we're looking at here.

              So I think the key point here, your Honor, that's what

we tried to do when we formulated this plea agreement was to

key the offense level to what we knew we could prove, which was

the long-term marijuana network and the high-level membership

in the gang.  So a plea to racketeering conspiracy with the

four-level leadership enhancement, that's also key to the

marijuana guidelines, we felt like it encapsulated what we knew

about Mr. Ramos and what we could prove right now about

Mr. Ramos.

              We do believe that the most significant fact that your

Honor should consider is the duration of his leadership at the

highest levels of the gang and that this is not a minor player

1    and this is not someone that was a leader for a short period of

2    time.  And that's really why we're standing here today, your

3    Honor.  That's really why Mr. Ramos was included in this case.

4          And I can answer any questions your Honor has, but our

5    position is that the guidelines range in this case was

6    carefully thought out, and we believe it positions Mr. Ramos

7    exactly where he should be in terms of relative culpability as

8    well.

9          THE COURT:  Is the government pursuing forfeiture?

10          MS. HELLER:  No, your Honor.

11          THE COURT:  All right.  Thank you.

12          Mr. Epstein.

13          MR. EPSTEIN:  Your Honor, if your Honor please, may I

14    use the podium?

15          THE COURT:  Sure.

16          MR. EPSTEIN:  I'm a little nearsighted and I can't see

17    my notes if I stand up and can't see my notes on the table.

18          THE COURT:  Happy to have you there.

19          MR. EPSTEIN:  Judge, let me just cover briefly, I'm a

20    little bit taken aback by the government's kind of sleight of

21    hand or guilt by implication arguments that they've made

22    throughout their submissions and that they've made again today.

23          I think, first of all, let me correct one thing right

24    away.  There was no cocaine found in Mr. Ramos's apartment.  I

25    believe I've seen a lab report that came back to be some kind

of cleaning fluid.  It was white powder, suspected cocaine, and

I believe the lab report that came back was that it was tested

and found to be a household cleaning agent of some kind.

          MS. HELLER:  I stand corrected then, your Honor.  I

was trying to find the lab report, and I completely trust

Mr. Epstein on that and I'm sorry for that misrepresentation.

          MR. EPSTEIN:  And the implication is that we didn't

investigate the El Combo but we didn't really know what he did

but he must have done something bad.  What we know a lot about

El Combo and we know a lot about the nature of his leadership

of El Combo.  I think one thing we know for sure is that he was

totally against violence.  He expressed that in numerous

conversations.  I cited those conversations to your Honor both

from the wiretap and also from his Facebook account in which

people messaged him both during the time he was on the street

and immediately after his arrest saying you don't belong in

jail.  You've told us to stay off the street, and we consider

you like a father.

          (Continued on next page)

1          MR. EPSTEIN:  Also, in his wiretap conversations, he

2     repeatedly, and forgive me for the boldface, your Honor.  I

3     know sometimes people don't like to be pointed at a boldface

4     thing, but I thought it was important to show the flow of all

5     of those statements that he made that were nonviolent

6     statements to show that he was committed to nonviolence.  The

7     thing about Flaco is almost like a sleight of hand.

8          If your Honor could understand, and does understand, I

9     am sure, that he and the Bad Boys, not withstanding some of

10    these conversations that were had between him and Gonzalez --

11    and, by the way, there were only two conversations.  There

12    weren't a series of them.  In the conversations there are some

13    indications that we pointed out that Mr. Ramos was

14    uncomfortable speaking to Mr. Gonzalez and tried to avoid

15    Mr. Gonzalez.  There were also Junito conversations from the

16    jail where Junito wants to see Mr. Ramos because Mr. Ramos is

17    not going with the program.  He is acting independently from

18    the Bad Boys.  He does not want to be part of the Bad Boys, and

19    they are trying to bring him in the fold.

20          So to conclude --

21          THE COURT:  Sorry, does that mean, just help me with

22    what the right inference is from that.  I think you are trying

23    to suggest the inference that he therefore nonviolent.  The

24    other inference would be that if Junito wants to bring the two

25    factions together.

1            MR. EPSTEIN:  Yes.

2            THE COURT:  And that Mr. Ramos is the leader of a

3     different faction, but it wouldn't say one thing -- one way or

4     the other about a different philosophy *vis-à-vis* violence.

5            MR. EPSTEIN:  No, but I think there is one implication

6     from that that is clear, and that is that the Bad Boys and

7     El Combo were two different factions that didn't want to have

8     anything to do with each other.  Mr. Ramos's philosophy with

9     respect to the El Combo was, Don't get involved in violence.  I

10    don't want to deal with violence.  That stuff is terrible for

11    us.  It hurts us.  It hurts the young people who are members of

12    the El Combo, and we don't warrant to do it.  That's what it

13    shows.

14            And the Junito conversations are Junito saying to

15    people, Contact Moreno and get him to come into the fold.  And

16    some of those -- and two of those conversations, one I cited in

17    my letter to probation and not in my main letter.  I cited one

18    in my main letter and one in my letter to probation.

19            This is a letter on Mr. Zissou's letterhead.  "Junior

20    Sierra tells someone named @Folano that he wants to speak to

21    the defendant" -- that is, Mr. Ramos -- "that he has a whole

22    year of throwing in the towel on him and his people, and they

23    are not trying to cooperate.  They just do what they want to

24    do."  That's call number 122 of the Junito conversations.

25            Then I cite another one in my main letter.  It is also

E3e2ram2                         Sentence

1   one of the Junito conversations.

2              (Pause)

3        MR. EPSTEIN:  I'm sorry.  I am not finding it right

4   away, but it is in there.  Just give me second.

5        MS. HELLER:  While Mr. Epstein is talking, if I could

6   reserve -- I know your Honor doesn't do it, as you had

7   mentioned, but -- a very short amount of time to respond to

8   him.

9              (Pause)

10       MR. EPSTEIN:  On page 3 of my main letter, "According

11   to the discovery in the case, as reflected in several calls

12   between an imprisoned leader of the Trinitarios" --

13       THE INTERPRETER:  I'm sorry.  Request for the attorney

14   to slow down.

15       MR. EPSTEIN:  I apologize.

16       "According to the discovery in the case, as reflected

17   in several calls between an imprisoned leader of the

18   Trinitarios known as Junior and members of the Bad Boys,

19   including their leader, known as "Webb," it is clear Mr. Ramos

20   resisted participating in their overall vision for the

21   organization.  Webb is heard to complain to Junior about

22   Mr. Ramos and discuss with him on various occasions that

23   Mr. Ramos, who was known as "Moreno," was uncooperative and did

24   not want to be controlled by them.  For example, during one

25   such discussion on November 26, 2010, Webb reports to Junior, I

E3e2ram2                          Sentence

went to Moreno's mother's funeral to speak to him.  Moreno told

me they need to talk among themselves first, so this is holding

us back," "holding us back" meaning holding back the unity that

Junior was seeking to establish.

          So to me it sort of strikes me as unusual, given that

relationship between the Bad Boys and El Combo, that somebody

from El Combo would be consulted on a veto, would have the veto

power to give a green light, whatever a green light means, and

I think we are certainly not exactly sure about that, but that

he would have the power to do that or would have been consulted

about doing that.  And I think it is clear that had he been

consulted, he probably would have said everything that he said

in the conversations that are recorded with Webb, which is,

This stuff is bad, don't get involved with it.

          So I just wanted to start off by saying that this sort

of attempting to accuse him by virtue of a vacuum I think is

decidedly unfair.

          Now I would like to go into my remarks which I have

prepared for the court.

          THE COURT:  Please go ahead.

          MR. EPSTEIN:  First of all, I think that the

guidelines in this case, although there are no guideline

departures in the case, I think the guidelines in this case

treat him unfairly in the sense that they overrepresent his

future recidivism, they overrepresent the things that criminal

E3e2ram2                           Sentence

history and guidelines are supposed to represent.  Take the

criminal history, your Honor has already dealt with the YO, and

there would have been some sort of an issue as to whether or

not that meant the ten-year requirement, but your Honor has

dealt with that.  I am not even going to go into that.  But if

you look at all the other aspects of his criminal history, he

was 22 years old at the time.  He is now 36.

        And if you look at the issue of his committing a crime

when he was on parole, I think we stated it during the plea

allocution that while we agree that he was a Trinitario and

therefore was -- did he commit some sort of racketeering

participation while he was on parole, I think it is clear from

the chronology that he becomes seriously involved after his

parole, after he meets his wife, after he meets his stepson,

who was involved with this group.  That's when his

participation starts.  So he is sort of on the cusp.  That two

points for parole I think is overstated.  I think the other

points he accumulates when he is 22 years old are overstated.

So that he gets -- forgive the vernacular -- screwed on the

guidelines with respect to that to some degree.

        Also we have the two points less that we discussed as

a result of the Attorney General's memorandum, and we also have

that four-point role adjustment, that four points for

leadership, and I think we can fairly say that we know he was a

leader.  He himself says in some of the conversations with

1    Mr. Gonzalez that, I felt disrespected when somebody from my

2    group went to Yonkers and formed another group and nobody told

3    me so.  We know that he is a leader, but that statement alone

4    and the prison calls with respect to him and the other

5    statements that he makes I think characterize his leadership in

6    many respects as a benevolent leader, as someone who was

7    against violence, who was an *éminance grise* and sought to

8    influence some of his members not to be on the streets.  So I

9    think that that four-point leadership enhancement also doesn't

10   go as far as it would have been intended to go in terms of

11   portraying his culpability.

12        We also, I think, can conclude that one aspect of his

13   so-called leadership was to keep troublemakers out of his area,

14   and that I suppose has two sides to that coin.  One side of

15   that coin is territorial, that he is selling marijuana in the

16   area and he wants to keep it that way.  But there is another

17   side to that coin, and that is that he doesn't want

18   troublemakers to be in his area because he doesn't want his

19   people to be involved in trouble.

20        So I think when you talk about leadership, the

21   question really is how do you characterize that leadership?

22   And I think in this case it is in many respects benign and in

23   many respects ambiguous and not always the kind of leadership

24   that should draw a dire conclusion in terms of the guidelines.

25        Your Honor, I thought it was Clausewitz, but it was

1   Aeschylus who said that in war, truth is the first casualty.

2   And I have developed --

3            THE COURT:  He also said that war is a continuation of

4   politics by other means.

5            MR. EPSTEIN:  I did see that.  I did my Clausewitz

6   research before making sure it was Aeschylus and not

7   Clausewitz.

8            I have an Epstein corollary to the Aeschylus

9   statement.  If truth is the first casualty in war, then in a

10  100-defendant RICO prosecution -- or I don't know if we are up

11  to 100 yet -- let's say 80-defendant RICO prosecution, the

12  first casualty is individuality.

13           I would like to share with you two personal

14  observations that, for me, help define this case.  The first is

15  that, as we know, Mr. Ramos regained custody of his children

16  who were five and six years old at the time.

17           THE COURT:  I couldn't quite tell.  Had they been with

18  the mother or were they in a foster home at the time?

19           MR. EPSTEIN:  Both.  They had been taken away from the

20  mother because of certain negative aspects of her personality.

21  I think her companions were abusing them, and they went into a

22  foster home.  Mr. Ramos, when he got out of prison, one of the

23  things he did was he took parenting classes and he hired a

24  lawyer, went to family court, and got them back, first on a

25  visitation basis and then on a permanent basis.  He was awarded

E3e2ram2                          Sentence

1    custody of them.

2                THE COURT:  Who takes care of the kids now that he is

3    in jail?

4                MR. EPSTEIN:  Dominicana, who is in court.  His wife,

5    who is in court.

6                THE COURT:  She is functionally their stepmother?

7                MR. EPSTEIN:  She is their stepmother, yes.  She takes

8    care of them.

9                Very early on in this case I had a *Jerry McGuire*

10   moment.  I don't know if you remember that movie.

11               THE COURT:  I do.

12               MR. EPSTEIN:  There were two famous quotes in that

13   movie --

14               THE COURT:  "Show me the money."

15               MR. EPSTEIN:  The other one is "You had me at hello."

16   Well, when I met Mr. Ramos's children, they had me at hello.

17   Here they were, with their history, braces on their teeth, well

18   taken care of, and that said more to me than anything in this

19   case could say about what Mr. Ramos had accomplished after he

20   came out of jail.  So even without knowing about his stellar

21   work record, about the fact that he worked two jobs, about the

22   fact that he went into debt in order to get them back, they had

23   me at hello.  I knew all I had to know about his family

24   relationship when I saw that.

25               The second personal observation that I would like to

1    make for the court is that my first job in the criminal justice

2    system was as an assistant district attorney in the Bronx, and

3    I was in the rackets bureau.  My second job was when the

4    district attorney that I worked for became a judge.  He was a

5    judge in New York County and Frank Hogan was the district

6    attorney.  I went to New York County.  I was sort of liberated

7    from the Bronx and went to New York County and I was his law

8    secretary.  I had two main functions at that point, one of

9    which was to teach a course to the new Rockefeller judges about

10   eavesdropping under state law.  Because I had been in the

11   rackets bureau, I had supervised a number of wiretaps.  Now I

12   was in this Judge Roberts' chambers.  I can tell you who he

13   was, Burton Roberts, very well-known, blessed memory, my

14   mentor.  One of my jobs was to teach the new Rockefeller judges

15   in the expanded judiciary about the state of eavesdropping; and

16   the second one was to review eavesdropping applications that

17   were made by the New York County District Attorney's office and

18   advise the judge about the various issues as to whether he

19   should approve them and the issues that came up.

20        One of those applications from the New York County

21   District Attorney's rackets bureau was for a bug in the dining

22   room chandelier of a bookmaker.  It wasn't a wiretap.  It was a

23   bug to record ambient conversations.  After a month or two of

24   that bug being in existence and not being very productive, an

25   application for renewal was made and the participants in a

E3e2ram2                          Sentence

conversation were quoted as saying, "Break his leg."  Well

immediately the application for renewal came in and there came

an application for an amendment to loan sharking and extortion.

And the support of that amendment was they overheard on the

bug, "Break his leg."  So the judge approved the application,

and the individuals were indicted for not only gambling, but

loan sharking conspiracy, and that was all fine, only to learn

later, during suppression proceedings, that the quote "break

his leg" was actually "break its leg" and it occurred while the

participants were dining on a chicken.

         Now, after this revelation, the prosecutors in the

case redoubled their efforts to cast even the most ambiguous

statements by these people as supporting their theory of the

case.  They were, I think, embarrassed by the revelation.

         Why do I raise that now?  Because in a very

well-meaning way, the investigators in this case overheard

statements that Mr. Ramos was making and as a result of the

casualty of individuality that comes when you have a

100-defendant case, they stereotyped that statement as "I broke

someone's melon and sent them to the hospital."  And it turned

out to be the equivalent of "break his leg."  It was actually

that, Somebody was assaulted.  I rushed him to the hospital.  I

aided that person.

         So we now have, in the rest of the conversations, this

gloss put on various statements that he made in those two

1    conversations as if they were high-level discussions at some

2    sort of a conference of elders about goings-on in the

3    Trinitarios, when really an examination of the conversation

4    reveals that Webb was doing most of the talking and telling him

5    what was going on because he was not privy to a lot of this

6    stuff and that he was listening but not saying much because he

7    didn't have much to say other than, Don't get involved, and

8    here are examples of why I didn't get involved.  He cites

9    certain examples of somebody taunting the other side and he

10   dressed him down but didn't want to get involved in taking any

11   action against him.

12          I think that what really speaks volumes about this

13   case is that the government -- we know, you and I, Judge, and

14   everybody sitting here, that this was a skeleton indictment

15   that was brought.  It was a RICO conspiracy indictment with no

16   overt acts or objects, and that the government then spent the

17   better part of a year and a half trying to fill in the blanks.

18   When all was said and done, what we got from the government in

19   the government's sentencing submission was kind of a begrudging

20   acknowledgment that he was not involved in any violence, that

21   he didn't order any violence or didn't commit any violence,

22   only to come now to the point where, again, the government is,

23   in effect, asking you to punish him for what must have happened

24   that we don't really know about, but it must have happened.

25          Well, I ask the court to think about the "you got me

at hello" factor here.  Look at his background.  Look at what

he did in state prison.  He got himself a GED.  He came out.

He went to work and worked for 14 years.  He got his children

back.  He got himself into debt and, because of those debts, he

became involved again in marijuana dealing, which we

acknowledge, but all the while being against violence, decrying

the violence, complaining about the violence.  And then, just

take a look at this little insignificant document that I

attached.  I didn't even know I had it, but Mr. Ramos must have

given it to me.  It is a work evaluation from the MDC; and in

this little insignificant document, whoever was supervising him

at the MDC called him like the ideal employee -- eager, hard

working, somebody who could train other people as to how to do

the job, always reliable.

        So I can say, Judge, he had me at hello and he had me

at goodbye, and now it is up to you, your Honor, I think, to do

the right thing in this case.  What I recommend the court do is

I think a fair starting point is the sentencing guidelines

without the role enhancement in terms of the number that the

court comes up with, and to go down from there as a result of

the 3553(a) factors, to impose the sentence that I recommended

in my presentence submission, which is a sentence of 48 months,

and that's what I urge the court to do.

        Thank you.

        THE COURT:  Thank you.  Thank you, Mr. Epstein.

1          MS. HELLER:  May I just have a few minutes, your

2     Honor?

3          THE COURT:  Say it again?

4          MS. HELLER:  May I have a few minutes to respond?

5          THE COURT:  Yes.

6          MS. HELLER:  Your Honor, the government strongly

7     disagrees with Mr. Epstein's portrayal of Mr. Ramos as a peace

8     lover, and I believe his characterization of El Combo as some

9     sort of peace-loving faction of the Bronx Trinitarios gang

10    could not be further from the truth.

11         Your Honor has heard about countless conflicts between

12    violent conflicts, shootings, slashings, stabbings, a murder

13    that took place back and forth between El Combo and the Bad

14    Boys.  This was not a one-way conflict.

15         And, your Honor, in terms of Mr. Ramos's specific

16    role, if your Honor has any doubts about whether Mr. Ramos was

17    opposed or was not opposed to violence that went on, we

18    respectfully request your Honor adjourn this proceeding so that

19    we can have a *Fatico* hearing at which we would call witnesses

20    who would characterize Mr. Ramos's leadership of El Combo and

21    they would testify that he was not a peace-loving leader.  They

22    would explain that he was fully involved and that it was his

23    decision to order people to do things or to stop them from

24    doing them.

25         And then I need to quote from -- I wasn't planning on

E3e2ram2                          Sentence

getting into the ins and outs of the calls, but I need to quote

from the wiretap, your Honor, because I think it is important.

I need to use Mr. Ramos's words himself, in the August 22 call,

which Mr. Epstein attached in his sentencing submission.

          I am going to read from page 4 of 7 in that call, and

this is the portion, and I can.

          THE COURT:  Give me one moment.  What's the date of

the call?

          MS. HELLER:  August 22.

          THE COURT:  This is the start time at 22:48:58.

          MS. HELLER:  Yes, and I am reading from the page that

says at the bottom page 4 of 7.

          THE COURT:  Go ahead.

          MS. HELLER:  And the context of this call, it is

Mr. Gonzalez and Mr. Ramos.  Mr. Gonzalez, again, is the head

of the entire Bronx.  He is consulting Mr. Ramos, who is the

head of El Combo.  And the reason, by the way, that Mr. Epstein

said, Why would he be consulted?  Because both the heads of the

Bad Boys and El Combo would be consulted because they were

equal, and Mr. Gonzalez was above both, so just to make that

clear.

          All right.  So then reading from the second full

paragraph where it says "Richard."  "You know, nobody did

Moreno.  You know for sure that nobody did.  Just handle that.

Me personally, I'm tired of talking.  Already these [N words]

E3e2ram2                    Sentence

1    that's out of line.  All them 268 [N words], we been spanking

2    them [N words].   I been out there personally.  We've been

3    spanking them [N words], every day for the past month or so.

4    I'm not talking no more."

5            Then Mr. Mr. Ramos says, "No, I'm telling you" -- and

6    I'm not going to read this paragraph because he goes on to

7    describe an interaction that he has had with a 268 person.  268

8    is Flaco's faction.

9            THE COURT:  268 is what?

10           MS. HELLER:  26 is Flaco's faction.  It is 268 Sunset.

11           So Moreno is talking about an interaction which he had

12   with a 268 person.

13           And then Mr. Gonzalez says, "That's what we on, [F]

14   everybody.  Whoever ain't with our program, it's a wrap.  I'm

15   not playing no more."

16           Mr. Ramos:  "Me neither."

17           Mr. Gonzalez:  "Whoever ain't with you or with the [N

18   words] that's authorized, you getting spanked, [N word]."

19           Mr. Ramos:  "I told this [N word] from who'd I see?

20   'You got 24 hours [N word].'  I went to 107.  I went up there.

21   I said, 'Ya got 24 hours, my [N word].  Anybody not with the

22   program, ya gonna get down or ya gonna lay down.  Ya wanna run

23   107 ya run 107 up here in 107.  Ya don't come to the Bronx for

24   that [S word] without authorization.  Point blank and simple.'"

25   It goes on.

1          This is not the way someone who is a peace lover,

2     doesn't want conflict, someone who is saying, Stop.  This is

3     full participation, full dialogue with Mr. Gonzalez about this

4     violent conflict that's escalating and escalating, saying, Get

5     out of here.  You don't have authorization.  I'm going to talk

6     to you.  Get out.

7          It continues on page 6, two pages later.  They are

8     talking about another new chapter that's been established.  It

9     is Pelotero's chapter.  And I am looking at the second

10    paragraph.

11         Mr. Ramos says, "Junito might get tight with me but

12    them [N words] is gonna get spanked.  Off the muscle, I feel

13    disrespected.  These [N word] just bounced out of here.  They

14    went up there.  They wanna start a business, just get some [F

15    word] little or some [S word]."

16         And then Mr. Gonzalez says, "Hear me out, Moreno.  Let

17    them [N words] be because in reality we got bigger fish to

18    fry."

19         Mr. Gonzalez is the one here saying, Calm down,

20    Mr. Ramos; calm down, Mr. Ramos.

21         Then Mr. Ramos says:  "Imma put it on standby because

22    you asked me to put it on standby."

23         So here we have a situation where it is Mr. Ramos, not

24    Mr. Gonzalez, who is talking about escalating, about violence,

25    about spanking someone.  And then later down that page

1              Mr. Ramos: "Me and you, we always on the same page."

2              This is not a situation where Mr. Gonzalez is

3     controlling Mr. Gonzalez, Mr. Gonzalez is forcing Mr. Ramos to

4     engage in acts of violence.  These are two high-level leaders

5     of a violent gang talking about violent management of that

6     gang.

7              And we are not okay with Mr. Epstein's comments about

8     us not individualizing defendants.  We have carefully

9     considered every defendant in this case.  We have carefully

10    considered every wiretap call in this case.  We believe our

11    characterization of Mr. Ramos's role is fair, it is accurate,

12    it is based on our hours and hours of meetings with multiple

13    witnesses, and our examination of multiple wiretap calls.

14             THE COURT:  Thank you.

15             Mr. Ramos, do you wish to be heard?

16             THE DEFENDANT:  Yes, your Honor.

17             Your Honor, with all due respect.

18             THE COURT:  Speak into the microphone kindly.

19             THE DEFENDANT:  With all due respect that you deserve,

20    your Honor, with all due respect that you deserve, your Honor.

21             MR. EPSTEIN:  Is it okay if he sits down, Judge?

22             THE COURT:  Yes, I think he should use the microphone.

23             THE DEFENDANT:  You hear me now, your Honor?

24             THE COURT:  I can hear you.

25             THE DEFENDANT:  I heard Ms. Heller speak, and I want

E3e2ram2                              Sentence

1    to comment on that.  I don't deny I am the leader of the Combo.

2    I am not denying that, your Honor.  I am not denying that I

3    sold drugs for a reason -- to have a home, not to get kicked to

4    the street.  But when she claims that Richard Gonzalez -- I had

5    no affairs with Richard Gonzalez.  Richard Gonzalez claims or

6    had told her or I don't know how it came about, the

7    conversation, he did -- I had two wiretaps with him, and in one

8    of them wiretaps, when I am talking to him, in the background

9    my son, younger son is with me.  I'm going to the store with my

10   younger son.  I rushed Richard Gonzalez because I didn't want

11   to be a part of it.

12        The Combo, when I became a trinny, I became a trinny

13   in jail for different reasons.  I didn't have money.  I didn't

14   have clothing.  I didn't have things like that.  My family was

15   very poor.  They provided me with these things.  I became a

16   trinny in jail for a totally different reason than from what it

17   is in the street, your Honor.

18        When I came out, I worked.  My concentration was on my

19   family, my kids.  I then got married, something that I never

20   did, first time experience, and I pray and thank God that I did

21   get married to a wonderful wife.

22        I raised my kids, raised my stepsons to the best of my

23   abilities.  Child support, had arrears in my neck.  $25,000 for

24   a person just coming out of prison, there is no way I could get

25   that amount of money.  I still worked two jobs.  I tried to

1    commit, tried to make payments, have my son's custody, while he

2    was in my custody, I'm still paying back the arrears.

3            I apologize because I sold marijuana to try to

4    alleviate the hardship that I had.  For that I take full

5    responsibility.  But when Ms. Heller states here a

6    conversation, Richard Gonzalez called me, not me calling

7    Richard Gonzalez.  And I told Richard Gonzalez, because he

8    wanted me to be a part of a Bad Boys, which I am not, it is

9    absurd to me.  The Bad Boys did whatever they had to do.  Us,

10   the majority of the guys that were with me, they were

11   legitimate.  They have jobs.  These guys, they was not going to

12   school.  I made them go to school.  They had to bring grades.

13           I'm not saying that I am a lamb and I am perfect.  I

14   didn't commit no violence, your Honor.  I have kids of my own.

15   You know?  And for the reasons I became a Trinitario is totally

16   different from the reasons Richard Gonzalez became a

17   Trinitario.  I am not a saint, but my life that I did in the

18   past, the drug selling, I left it.  The only reason I sold

19   marijuana, and I reply to your Honor again, was because I had a

20   hardship.

21           My wife, she works, but it's hard for her.  My wife is

22   sick, okay?  My kids, one of them has ADHD.  The other one has

23   a mental problem because of his biological mother, being two

24   years in a foster care that my family didn't even know that

25   they was in.

1           So I don't portray to be this innocent, perfect guy.

2      I am not.  What I tell you with my open heart, and God knows,

3      is that I never committed no violence.  What I did was try to

4      help these young fellows.

5           Now, Webb wanted me to part of the Bad Boys and become

6      one.  I would never accept that then, I would not accept that

7      now; and if he was standing right here I would look into his

8      eyes and tell him the same thing I am telling your Honor, that

9      he knows better in his heart.  He knows the truth.  He knows

10     that I was not part of his side of the team.  He knows that I

11     had people doing the right thing.

12          And as far as that Flaco, your Honor, that fake Flaco,

13     I knew him.  I knew that kid Flaco.  And at the present moment

14     that Flaco character was in Rikers Island, and he had became --

15     when he came up to the Bronx, he ended up having a job.  While

16     he was in the street trying to do other things, I made him get

17     a job.  I made him go back to his mother's house.

18          These are the things the government don't look at.

19     These are the things that the government don't know.  Why?  I

20     am the only one of the Combo here.  I'm not a part of the Bad

21     Boys.  They not my friends.  They not my, oh, I'm going to help

22     you out.  They here to squeeze me.  If they could get a 5K1 off

23     of me, then that's what they are going to do.

24          I'm not here telling you, your Honor, to try to make

25     it seem like I am a wonderful person, but I am not -- and I

E3e2ram2                         Sentence

1   will repeat, I will refuse that Ms. Heller plummeted my name,

2   the way it is being tarnished.  I am not saying, like I said

3   before, I say it again, your Honor, I take responsibility for

4   being a Trinitario member.  I won't deny that.  I take

5   responsibility for selling marijuana.  I don't deny that.  I

6   stayed without selling drugs for ten years your Honor when I

7   came home, when I could have easily, easily got the chance to

8   go back and sold drugs from the start, easily.  I never went to

9   public assistance.  I never tried that, nothing.  Before I

10  start selling weed, I knocked on every single door, every

11  single door.  But I would not have my wife, my kids, my

12  daughter, and all my family members in the street because I

13  cannot get a helping hand.  So I did what I thought was best,

14  was legit.

15          And, yes, I have a double life, like Ms. Heller said,

16  and I sold weed.  Yes.  I did.  But from there, to hurt people?

17  No.  I have two sons in the audience.  I have kids.  Why would

18  I hurt somebody, that I wouldn't want that to happen to my son.

19  Right now he is 17 years old.  He could be in that life.  I

20  couldn't control my kids.  I can't say and tell my kids, Don't

21  do this if I am doing it, your Honor.

22          ACS was in my house constantly, your Honor, watching,

23  observing, the environment of the kids.  If you well know, your

24  Honor, as protective services, once you get them as a foster

25  kid, they look at you.  They examine you.  They evaluate you.

E3e2ram2                          Sentence

1              These things coming to me, and I'm sorry and I am

2       about to say this, and I don't know if I am wrong -- my lawyers

3       might not agree with me, and I apologize -- but Ms. Heller is

4       going by what Richard Gonzalez is telling her, his events, what

5       he -- what helps him out in front of your Honor.  This is

6       what's happening.  Does she have facts?  If there is any facts

7       of any violence in paper, an officer, an arrest or anybody that

8       could come forward and say that I physically hurted them, then

9       I will be quiet, your Honor.  I will take whatever you want to

10      give me, whatever sentence you feel will be right for me.  But

11      there is nobody here that can say that I ever hurt them ever,

12      ever.

13              As a matter of fact, there is a young gentleman that I

14      helped out.  They wrote in the Facebook, and I didn't even know

15      him, and I told him to get a job.  And his father died, and I

16      seen them like my son.  They was kids that was thrown in the

17      street that was running crazy in the street, didn't have a

18      place to live.  I used to let them stay in my house with the

19      option of you got to work, get better, go back to your family

20      with a high school diploma.  The majority of the guys that I

21      know that are supposed to be Combo, they all legitimate

22      workers.  Some have high school diploma.  Some don't have high

23      school, but they work legit.

24              That's all I have to say, your Honor.  My life is in

25      your hands.  First, in God's hands.  God knows, if anybody, God

E3e2ram2                          Sentence

1   knows what I have done, and what I have been.  Now I plead to

2   you, your Honor, that my life is in your hands.  You know what

3   I'm saying?  You understand, your Honor?  Whatever you decide,

4   I have to accept it, but I want you to know that the thought of

5   me being a violent person, of such criminal, that's not me.  I

6   don't hurt people.  There is a lot of people out there that I

7   helped.  There is a lot of families out there that I got their

8   kids and took them from the wrong turn to a positive turn.

9            Did I have to deal with Webb?  I had to talk to him

10  them two conversations.  Why?  Because he is ranked so high.

11  He is above me.  But I didn't have to.  He could be as high as

12  the president, but it is up to my choice to accept his deals.

13  It is my choice to accept if I want to run with what he says,

14  and I didn't.  And for that today, Richard Gonzalez is slashing

15  me.  For that today, Richard Gonzalez will step on me.  And

16  what I really believe that Trinitario is all about is to get

17  himself out of problems.

18           That's all I have to say, your Honor.  I thank you for

19  all this time you took looking into the case.  I apologize to

20  the United States government.  I apologize first and foremost

21  to God for me being here, and I regret the mistake of me

22  selling weed.  And I apologize to my family, my wife and my

23  sons that are in the audience.  They have to see me after ten

24  years sitting here in this court, being charged of a crime.

25           Thank you, your Honor, for your time.

E3e2ram2                          Sentence

1              THE COURT:  Thank you, Mr. Ramos.  We are going to

2       take a five-minute recess.  Thank you.

3              (Recess)

4              THE COURT:  Is there any reason why sentence should

5       not now be imposed?

6              MR. EPSTEIN:  No, your Honor.

7              MS. HELLER:  Not unless your Honor would like a

8       further hearing.  Not unless your Honor would like a further

9       hearing on any of the facts.

10             THE COURT:  I don't.  Thank you.

11             As I have stated, the guideline range that applies to

12      this case is between 100 and 125 months' imprisonment, although

13      the court has committed to impose a sentence no higher than 87

14      to 108 months, consistent with the parties' plea agreement.

15             Under the Supreme Court's decision in *Booker* and the

16      cases that have followed it, the guidelines range is only one

17      factor that the court must consider in deciding the appropriate

18      sentence.  The court is also required to consider the other

19      factors set forth in 18 U.S.C. § 3553(a).  These include the

20      nature and circumstances of the offense and the history and

21      characteristics of the defendant, the need for the sentence

22      imposed to reflect the seriousness of the offense, to promote

23      respect for the law, and to provide just punishment for the

24      offense, to afford adequate deterrence for criminal conduct, to

25      protect the public from further crimes of the defendant, and to

E3e2ram2                          Sentence

1    provide the defendant with the needed educational or vocational

2    training, medical care or other correctional treatment in the

3    most effective manner.

4              It is important that the court avoid unwarranted

5    sentencing disparities among defendants with similar records

6    who have been found guilty of similar conduct.  That situation

7    is particularly important in a large multidefendant case such

8    as this, where there are various vantage points for comparison

9    and contrast.  The court is also required to impose a sentence

10   sufficient but no greater than necessary to comply with the

11   purposes set out above.

12             I find, after giving the matter a great deal of

13   thought, that the sentence I am going to pronounce is

14   sufficient but not greater than necessary to the satisfy the

15   purposes of sentence that I just mentioned.

16             Mr. Ramos, I have given a lot of thought to the

17   appropriate sentence in this case in light of the 3553(a)

18   factors and the purposes of sentencing.  These are my thoughts.

19             As of today, I have sentenced at least three dozen

20   defendants in this large case.  Your case presents an unusual

21   and, indeed, I think a unique combination of factors.  On the

22   other hand, you are a high-ranking member of a portion of the

23   gang or a part of the gang, higher ranking than almost all of

24   the defendants in this case that I have sentenced to date.  And

25   the quantity of marijuana you are responsible for under the

E3e2ram2                          Sentence

1    plea agreement, between 100 and 400 kilograms, I believe

2    exceeds that in any prior Trinitario sentencing.  Of course

3    there are other defendants who have not been sentenced who are

4    more senior, but as of now you top out or close to top out both

5    as to your rank and as to the quantity of marijuana.

6            On the other hand, there is no allegation that you

7    participated in an act of violence, that you instigated or

8    ordered an act of violence, or carried a gun.  There is also no

9    evidence that you sold drugs other than marijuana in connection

10   with the Trinitarios.  And there are aspects of your life that

11   are generally mitigating to a degree simply not present or even

12   close in most Trinitarios sentences.  So the right and just

13   sentence in this case presents by a considerable degree more of

14   a challenge than in most.  I have struggled with the right

15   balance here and I took the break I did now just to collect my

16   thoughts.

17           I am going to elaborate now and I am going to begin by

18   first addressing the factors that point in the direction of the

19   higher sentence and then address the ones that point toward as

20   lower one.

21           First of all, let me address the marijuana.  By your

22   own account, you were a drug dealer and on a prodigious scale.

23   Under the plea agreement, you are accountable for the

24   distribution of between 100 and 400 kilograms of marijuana.

25   Now, I understand that other drugs sold by the Trinitarios are

E3e2ram2                    Sentence

far more destructive than marijuana, including cocaine and

crack and various prescription medications, but your drug

dealing cannot be minimized as a small thing.  Marijuana

dealing can lead to addiction, it can lead to the use of and

addiction to harder drugs, it can lead to wasted lives, it can

destroy families and communities.  And in my two and a half

years on the bench I have seen far too many cases of drug

addiction that appeared to have started off with marijuana and

have led to harder drugs and all sorts of criminality.  Given

its scale, your drug dealing, by definition, enhanced those

risks for far too many people, and we will never know or be

able to trace what became of the people who you supplied drugs

to.

          Second, you were the leader of the El Combo faction of

the Trinitarios gang.  That is beyond dispute.  It is the

reason for your stipulation to the four-level leader

enhancement under the sentencing guidelines.  That is a

significant aggravating factor.  I fully understand that you

yourself personally are not accused of participating in or

instigating acts of violence committed by El Combo.  I also

accept that aspects of the gang's conduct were not criminal and

that the gang on occasion could play a constructive role, the

example being here the support the gang provided for you when

you were in prison.  I also understand that there is dispute

between the parties as to your understanding and role in

E3e2ram2                        Sentence

1    connection with a particular green light.  But that dispute,

2    which I need not resolve here, and those other points cannot

3    and should not obscure the bigger picture.

4            In the aggregate, the Trinitarios were a violent gang.

5    It devastated its community.  The El Combo faction although, by

6    all accounts, far less violent than the Bad Boys, was on

7    occasion plenty violent.  I fully accept that you were not

8    personally involved in violence, that you did not commission

9    it, but it defies credibility to claim that you were blind to

10   the violent aspects of the overall gang or the faction you led,

11   and the evidence seems pretty clear that the El Combo faction

12   was in a violent dispute with the Bad Boys faction, in effect,

13   on your watch.  Given that, your leadership role is an

14   aggravating fact.  You, through your leadership, helped fortify

15   a gang that was, by any measure, up to no good, and your drug

16   dealing helped fund it.  Any objective assessment to your

17   conduct has to treat your leadership role in a major faction of

18   the Trinitarios as seriously aggravating conduct.

19           Putting all this in Section 3553(a) terms, this

20   conduct requires a substantial sentence for several reasons.

21   Such a sentence would reflect the seriousness of your conduct,

22   it would help promote respect for the law, and it is important

23   in the interests of general deterrence.  It is important that

24   the word go out to others who would consider either selling

25   prodigious quantities of marijuana or taking leadership roles

1   in dangerous gangs, that if they get caught, they will go to

2   jail and for a meaningful period of time.

3           Another factor that points toward a meaningful

4   sentence here is what we call specific deterrence, and that

5   means the need to send a message to you personally, Mr. Ramos,

6   that is sufficient to deter you from committing crimes.  Your

7   prior criminal record is not nearly as severe as some other

8   defendants in this case whom I have sentenced, but there are

9   also plenty who have had shorter criminal records.  The

10  presentence report reflects four prior convictions on your

11  part -- in 1996, actually conditional discharge based on your

12  being a youthful defender for criminal possession of 90 small

13  bags of crack; in 2000 for criminal sale of a controlled

14  substance; in 2000, again, for criminal possession of a

15  controlled substance, again crack; and, finally, in 2001, for

16  sale of a hallucinogenic narcotic.

17          The two longest sentence you have received were 45

18  days for the second to last conviction and a year to the last

19  one.  Those sentences, particularly the last one for a full

20  year, should have gotten your attention.  It should have been a

21  wake-up call to you to stop committing crimes and to clean up

22  your act.  I am sure that is what the judges in those cases

23  must have intended and hoped, but it didn't serve as a wake-up

24  call or at least as a successful one.

25          You got out of jail and you became an active member

E3e2ram2                        Sentence

and, indeed, a leader of the Trinitarios, essentially by your

own account a professional marijuana dealer.  I understand

there is a context that led you into the marijuana dealing

business but nevertheless you did it.  The sentence that I

impose therefore has to be much longer than the ones before to

supply the wake-up call that you need.  It has to be long

enough and loud enough to deter you personally from committing

any further crimes, and it will be.

        The final point I will make on this side of the

equation is this:  Today you are 35 years old.  You will be 36

in April.  The crimes you committed in connection with the

Trinitarios, unlike your historical narcotics distribution

crimes, were committed in your late twenties and your early

thirties.  A number of Trinitarios members I have sentenced

committed their crimes in the teens.  The point could be

validly made, and there is evidence for it, that they were

impressional adolescents led astray by older men to commit

crimes.  The argument was that they were still growing up and

that they were subject to the bad and reckless and impulsive

decision-making that young adolescent men sometime are.  That

argument is not available to you.  You were older and you knew

better.  Quite the contrary, as a 30-something-year old leader

of the Trinitarios, faction you were part of the problem.  You

were the older generation that lured in and led astray younger

members of the Trinitarios.  I must consider that, too, in

1    determining a just sentence.

2            As I noted at the outset, however, there are factors,

3    a number of them here, that point in the other direction in

4    favor of a lower sentence.  I am going to review them now.

5            To begin with, you accepted responsibility.  You pled

6    guilty.  That matters to me.  Had you not done so, the

7    guidelines would have called for a materially higher sentence,

8    and I can assure you I would have imposed a materially higher

9    sentence.  Your letter to me also reflected acceptance of

10   responsibility, and I thought your statement to me a few

11   minutes ago reflected, in my view, a very clear acceptance of

12   responsibility and understanding expressed in very emotional

13   terms of your acknowledgment of what you did wrong and your

14   regret for what you did wrong.

15           I also recognize that you have earned a very favorable

16   work performance rating for your jobs in prison.  That is some

17   indication of acceptance of responsibility.  It is certainly an

18   indication of turning over -- or beginning to turn over a new

19   leaf.

20           Second, as I have mentioned before, it does appear

21   that you personally steered clear of direct involvement in

22   violence, the violence characteristic of so many other members

23   of the gang.  You also did not carry a gun, I should add.  And

24   there are indications, as Mr. Epstein has said, of instances in

25   which you counseled against violence.  To be quite clear, I

1    certainly cannot find that that was always the case.  The

2    evidence is elusive on that point.  But there is certainly

3    proof that it was sometimes so that you counseled against

4    violence, and I recognize that.  That is also important to me.

5    If one were to take a look at the sentence I have imposed in

6    this overall case, the defendants as to whom I have imposed the

7    highest sentence have tended to be the ones who have engaged in

8    acts of violence.  And for good reason, you benefit from that

9    contrast.

10         Third, you have an impressive history of gainful

11   employment.  You have a long string of legitimate jobs.  A

12   factory, Blockbuster Video, Food Emporium, at FAO Schwartz, at

13   Jewish Medical Center, at Lewis Theater, at Fordham Glass.  It

14   did appear to me, although you resist the characterization by

15   the government, that the characterization is quite right that

16   you have led something of a double life, with one part being a

17   productive member of society and another part an active gang

18   member and marijuana dealer.  I don't know how else to put that

19   other than a double life.  Many of the Trinitarios I have

20   sentenced have led a single life, and it didn't include the

21   positive side.  That is, your life story in that respect is

22   much more than can be said for your Trinitario colleagues.

23   Here again you benefit by the contrast.

24         Fourth, I understand there is a context for your

25   emerging upon release from jail into marijuana dealing in

connection with the gang.  You were in financial dire straits

with child support arrears and other debts and obligations to

your children.  Obviously, and you know this that is no excuse

for drug dealing, but it is relevant context and it does help

explain why you did what you did.

          Fifth, in considering the weight to be attached to the

sentencing guidelines, I am mindful that the guidelines here

are overwhelmingly driven by the quantity of marijuana

involved.  As Mr. Epstein fairly pointed out, the Attorney

General has recently recommended a downward revision with

regard to the offense level triggered by certain quantities of

marijuana under the guidelines; and even before that it had

been my judgment, having presided over quite a number of

sentences now, that where the guidelines tend to be least

useful is when they are overwhelmingly and lopsidedly driven by

quantitative features, whether quantity of money in a fraud

case or quantity of a particular drug in a drug case.  This is

such a case; and, therefore, it is my view that the guidelines

significantly overstate the overall criminality here.

          Sixth, you have been in significant and demonstrated

ways a very dedicated father.  I was moved by your having

rescued your children from abuse in foster care after your

release from prison and having brought them into your home and

given them your love.  Many biological fathers in this world

and in this city, even those who have not been in jail, have

E3e2ram2                        Sentence

1   not taken their paternal responsibilities nearly so seriously.

2   Actions speak louder than words.  Your criminal actions speak

3   loudly here, too, but your paternal actions speak very loudly

4   as well.

5          And I was moved by the letters from your children, and

6   they are worth reading a little bit of here.  Your son Isaiah

7   writes in relevant part, "Your Honor, ever since my dad got me

8   and my brother out of the foster care system, my life has been

9   more positive.  My dad has showed me that a real man is made of

10  the following qualities: honesty, humbleness, caring, and being

11  truthful, and helping out your community, as well as your

12  peers.  That man needs to be a role model for kids as well as

13  adults.  I miss him so much.  To me my dad is my hero, and I

14  need him in my life."

15         And your son Anibal Jr. writes in pertinent part, "My

16  father has shown us the sense and value of education and

17  earning a dollar the right way.  He has told me that education

18  comes first and that without it us, as poor, lower class

19  families, would not survive in this society.  My father also

20  told me he wanted me and my brother to be better than what he

21  was, that he had high expectations of us, and that he never

22  wanted to see us commit the same mistakes as he did when he was

23  growing up."

24         Those are lovely things for children to be able to say

25  about a father, and I put weight in them.

1          All of that is very important to me and it is also

2     relevant under Section 3553(a).  Under Section 3553(a), among

3     the factors I am to consider are your history and your

4     characteristics.  You have positive ones here, too, notably,

5     your contributions as father.  I consider those, too, in

6     determining a just sentence.  It is right that on the day of

7     your sentence you be judged based on the totality of your life,

8     the good as well as the bad, and not evaluated solely based on

9     your crime.  The sentence I impose will do that.  I should say

10    that your remarks today and your track record as a father and

11    your demonstrated commitment to your children is relevant to

12    the issue of specific deterrence as well.  It gives me greater

13    confidence than I would otherwise have that, once released from

14    prison, you will be trying very hard -- I can't be sure that it

15    will be successful, but I am confident you will be trying your

16    hardest not to commit crimes.

17          In the end, my judgment is that a sentence within the

18    87- to 108-month guideline range is higher than necessary to

19    achieve the purposes of sentencing here.  My judgment is that a

20    sentence lower than that is sufficient to achieve the purposes

21    of sentencing.  A substantial sentence, nevertheless, is needed

22    here to reflect the seriousness of your criminal conduct, to

23    promote respect for the law, and to achieve general deterrence.

24          Your very able lawyers have urged me to impose a

25    sentence of 48 months' imprisonment.  It is rare that I have

1    accepted such a recommendation.  My view, however, after

2    careful consideration, is that, on the unique facts here, that

3    that recommendation is reasonable and right.  It fairly

4    balances the Section 3553(a) factors.  I will therefore state

5    the sentence I intend to impose.  The attorneys will have a

6    final opportunity to make legal objections before the sentence

7    is finally imposed.

8               Mr. Ramos, would you please rise.

9               After assessing the particular facts of this case and

10   the factors under Section 3553(a), including the sentencing

11   guidelines, it is the judgment of the court that you are to

12   serve a sentence of 48 months' imprisonment in the custody of

13   the Bureau of Prisons, to be followed by a period of three

14   years' supervised release.  I impose that same sentence on each

15   count, the sentences to run concurrently.

16              As to supervised release, the standard conditions of

17   supervised release shall apply.

18              In addition, you will be subject to the following

19   mandatory conditions:

20              You shall not commit another federal, state, or local

21   crime.

22              You shall not illegally possess a controlled

23   substance.

24              You shall not possess a firearm or other destructive

25   device.

E3e2ram2                              Sentence

1          You shall refrain from any unlawful use of a

2     controlled substance.

3          You shall submit to one drug test within 15 days of

4     placement on probation or supervised release and at least two

5     unscheduled drug tests thereafter as directed by the probation

6     officer.

7          You shall cooperate in the collection of DNA as

8     directed by the probation officer.

9          In addition, you must meet the following special

10    conditions:

11         The first one is one that I am adding to the ones in

12    the probation department recommendation which is, I will direct

13    you, as I have in the other cases in this overall case, not to

14    have any contact or dealings with any other members of the

15    Trinitarios gang.

16         I am also going to adopt the other special conditions

17    in the probation report.

18         You shall participate in a mental health program

19    approved by the U.S. Probation Office.

20         You shall submit your person, residence, place of

21    business, vehicle, or other premises under your control to a

22    search on the basis that the probation officer has reasonable

23    belief that contraband or evidence of a violation of conditions

24    of release may be found.

25         You are to report to the nearest probation officer

 1  within 72 hours of release from custody.

 2          I have the legal authority to impose a fine.  I am not

 3  going to do so.  I conclude that you don't have the ability to

 4  pay one.  The government is not seeking forfeiture or

 5  restitution is not a factor here.  I am required to impose and

 6  do impose a mandatory special assessment of $200 which shall be

 7  due immediately.

 8          Do either counsel know of any legal reason why this

 9  sentence shall not be imposed as stated?

10          MS. HELLER:  No, your Honor.

11          MR. EPSTEIN:  No, your Honor.

12          THE COURT:  The sentence as stated is imposed.

13          Ms. Heller, are there any open counts?

14          MS. HELLER:  Yes, there are, so we would ask to

15  dismiss them at this time and any underlying indictments as

16  well.

17          THE COURT:  Good.  That motion is granted.

18          Mr. Ramos, to the extent you haven't already given up

19  your right to appeal your conviction or your sentence as a

20  result of your plea of guilty and the agreement you have

21  entered into with the government in connection with that plea,

22  you have the right to appeal your conviction and your sentence.

23  If you are unable to pay for the cost of appeal you may apply

24  for leave to appeal *in forma pauperis*.  The notice of appeal

25  must be filed within 14 days of the judgment of conviction.

E3e2ram2                         Sentence

1              Is there anything further from the defense?  Is there

2     a request as to recommendation

3              MR. ZISSOU:  A recommendation to either Fort Dix or

4     the northeast region, whatever your Honor's pleasure is.

5              THE COURT:  I usually frame it in terms of a facility

6     closest to the New York City area, but if you have a specific

7     one, I do I will do that.  What do you want?  If you have a

8     specific facility for me to recommend, I will be --

9              MR. ZISSOU:  Fort Dix is the preferred facility.  Is

10    your Honor inclined to recommend a drug treatment program while

11    he is incarcerated?

12             THE COURT:  I think I will leave it to the judgment of

13    the Bureau of Prisons.  There is not an indication on the

14    record here that that is a problem for your client, so it seems

15    to me that there are others who are more deserving.

16             MR. ZISSOU:  I didn't know if your Honor had noted

17    that among the terms of conditions of supervised release was

18    that he would get drug testing.

19             THE COURT:  Look, if the Bureau of Prisons determines

20    he is eligible, that's fine.  I wasn't inclined to recommend

21    it.  I understand that is often a route in practice to a

22    shorter sentence, but the record here, in candor, unlike some

23    other cases, does not seem to indicate that it is needed.

24             MR. ZISSOU:  Understood.

25             THE COURT:  Anything else for the government?

E3e2ram2                          Sentence

1          MS. HELLER:  No, your Honor.  Thank you.

2          THE COURT:  Anything for the defense.

3          MR. EPSTEIN:  No, thank you very much, your Honor.

4          THE COURT:  Thank you.  Have a good day good weekend.

5    Mr. Ramos, I wish you well.  Let me just say are those your

6    family out in the back?

7          THE DEFENDANT:  Yes.

8          THE COURT:  I want to acknowledge your presence here I

9    imagine it is a hard day to watch family member, father,

10   husband be sentenced.  I want to thank you for your

11   participation in the process.  I believe that is your son who

12   wrote one every those letters as you can tell that made a

13   difference to me and helped give me a further better sense of

14   who your father is.  I appreciate your participating in the

15   process in that way.  Thank you.

16         MR. EPSTEIN:  Thank you, your Honor.

17                              - - -

18

19

20

21

22

23

24

25